IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALISHIA MARTIN,                    )
                                   )
                                   )     No. 11 C 8039
            Plaintiff,             )
                                   )     Magistrate Judge Arlander Keys
       v.                          )
                                   )
CAROLYN W. COLVIN,                 )
Commissioner of                    )
Social Security,                   )
                                   )
            Defendant.             )

MEMORANDUM OPINION AND ORDER

        This case is before the Court on Alishia Martin's motion for
summary judgment. She seeks a remand or outright reversal of the
Commissioner of Social Security's ("Commissioner") decision to
deny her application for Social Security Disability Insurance
Benefits. For the reasons explained below, the Court grants Ms.
Martin's motion and remands the case to the Commissioner for
further proceedings.

*Background and Procedural History*

        On September 22, 2007, Ms. Martin filed an application for
Social Security Disability Insurance Benefits, alleging that she
became disabled on January 31, 2007. R. at 137. Ms. Martin's
claim was denied on December 27, 2007 and again upon
reconsideration on March 19, 2008. R. at 214. Ms. Martin then
requested a hearing before an administrative law judge ("ALJ") on
May 6, 2008. R. at 214. Ms. Martin's case was assigned to ALJ
Marlene Abrams, who held the requested hearing on November 5,

2009. R. at 33. Ms. Martin, Medical Expert Dr. Larry Kravitz, and Vocational Expert Stephen Sprauer testified at the hearing. R. at 35.

Prior to the administrative hearing, Ms. Martin submitted an abundance of medical records which were entered into the administrative record. R. at 40-41. The medical records show that, in the fall of 2005, Ms. Martin began to experience long, heavy menstrual periods, and thereafter began taking birth control pills, which seemed to alleviate the bleeding for a time. R. at 341.

The record further shows that, in December 2005, Ms. Martin went to the emergency room after developing sudden right body weakness, complete numbness, and stuttering speech. R. at 487. A neurology consultation assessed Ms. Martin with left brain dysfunction, likely caused by a stroke. R. at 487. A CT scan of Ms. Martin's chest showed massive pulmonary emboli. R. at 487, 587. As a result, Ms. Martin was treated with the blood thinner Coumadin. R. at 518.

The record shows that, in March 2006, Ms. Martin again visited the emergency room complaining of chest pain; she underwent a chest x-ray and echocardiogram, both of which were normal. R. at 607-08.

In June 2007, Ms. Martin visited her gynecologist, Dr. Mark Vajaranant, and reported that her menstrual irregularity had

2

intensified in terms of the amount of bleeding after she started taking Coumadin. R. at 344. Dr. Vajaranant informed Ms. Martin that she was "most likely experiencing dysfunctional uterine bleeding secondary to ovulatory dysfunction compounded by Coumadin therapy." R. at 344.

The record shows that, on November 28, 2007, Ms. Martin underwent a psychiatric evaluation pursuant to her claim for disability benefits. R. at 402. Dr. Herman Langner conducted the interview, which was attended by Ms. Martin and her husband. R. at 402. Dr. Langner noted that Ms. Martin's affect was flat and that she was sometimes tearful during the interview, but that she was cooperative. R. at 402. Ms. Martin reported a history of stroke and indicated that it affected her left side but, while her doctor wanted to have her put on Coumadin, she refused to take it because she thought it was "rat poison." R. at 402. Ms. Martin also reported that she had been put on Zoloft for depression, but denied a psychiatric history prior to the 2005 incident. R. at 402. According to Dr. Langner, Ms. Martin was oriented times three, relevant, and coherent during the interview. R. at 403. She was able to repeat a series of five numbers forward correctly but was unable to repeat a series of numbers backward. R. at 403. She was able to recall one out of three items after three minutes, could perform simple calculations, but had difficulty with serial sevens. R. at 403.

Dr. Langner diagnosed Ms. Martin with dysthymic disorder[1] and gave her a global assessment of functioning ("GAF") score of 40.[2] R. at 404.

Ms. Martin also underwent an internal medicine consultative examination on November 28, 2007, which was conducted by Dr. Mashesh Shah. R. at 406. At that time, Ms. Martin stated that she was in good health until December 2005, when she had a stroke, causing left side weakness. R. at 406. Ms. Martin reported that she did physical and occupational therapy, but continued to have residual weakness and stiffness in the upper left extremity, any movement of which caused pain. R. at 406. According to Dr. Shah, Ms. Martin was alert and awake; had good hygiene, demeanor, and attitude; was cooperative; appeared to be in no acute distress; and walked slowly without any limp or assisting devices. R. at 407. Ms. Martin also had a full range of motion in all joints, normal gait, was able to heel walk and toe walk, and was able to squat down. R. at 408. Ms. Martin's finger grasp and hand grip was normal on the right and 4-5/5 on the

---

[1] "Dysthymia is defined as 'a mood disorder characterized by depressed feeling, . . . loss of interest or pleasure in one's usual activities, and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression.'" *U.S. v. Frazier*, 979 F.2d 1227, 1230 n. 3 (7th Cir. 1992) (quoting *Dorland's Illustrated Medical Dictionary* 55 (27th ed. 1988)).

[2] A GAF score of 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 34 (4th ed. 2000).

left. R. at 408. Dr. Shah noted that more of Ms. Martin's weakness was proximal muscle weakness, which was about 3-4/5, but her fine and gross manipulations on the right were normal. R. at 408. Neurologic examination revealed that Ms. Martin's motor strength was 5/5 in the right upper and lower extremities, 4-5/5 in the left lower extremity, and 3-4/5 in the left upper extremity. R. at 408.

On December 12, 2007, Dr. David Bitzer completed a Physical Residual Functional Capacity Assessment. R. at 418. Dr. Bitzer concluded that Ms. Martin was able to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for a total of six hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and push or pull without limit. R. at 412. Additionally, Ms. Martin was able to frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and stairs; and never climb ladders, ropes, or scaffolds. R. at 413. Furthermore, Ms. Martin's reach in all directions was limited due to mild residual weakness in her left arm. R. at 414. However, Ms. Martin had no other manipulative limitations, and no visual, communicative, or environmental limitations. R. at 414-15.

On December 26, 2007, Carl Hermsmeyer, Ph.D. completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment for Ms. Martin. R. at 432, 436. He found that Ms. Martin had mild restriction of activities of daily

living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. R. at 429. Dr. Hermsmeyer concluded that her mental status exam and her activities of daily living indicated that her impairment was more than non-severe. R. at 431. He also determined that, although Ms. Martin might have problems with understanding, remembering and the ability to carry out detailed instructions, she retained the mental capacity to perform simple one and two step tasks at a consistent pace. R. at 431. The Mental Residual Functional Capacity Assessment came to the same conclusion and found that Ms. Martin was moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. R. at 433-35.

A Medical Interrogatory concerning Ms. Martin's mental impairments was also completed by Ellen Rozenfeld, Psy.D. R. at 444. Based on Dr. Langner's psychiatric evaluation and activities of daily living report, Dr. Rozenfeld concluded that Ms. Martin's dysthymic disorder was severe, but that Ms. Martin nevertheless retained sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis, and to concentrate on, understand, and remember routine, repetitive instructions. R. at 444. Dr. Rozenfeld also concluded that Ms. Martin's ability to interact with and get along with the general

public, coworkers, and supervisors was not significantly limited. R. at 444. While Ms. Martin's ability to carry out tasks with persistence and pace would be somewhat reduced, it would still be adequate for completion of routine, repetitive tasks. R. at 444. Additionally, Ms. Martin's ability to handle stress and changes in the workplace would be reduced, but would still be adequate to tolerate the routine stressors of a routine, repetitive work setting and minor changes in routine. R. at 444.

At the administrative hearing, Ms. Martin testified that she lived with her husband and three sons in a third floor walk-up apartment. R. at 45-46. She testified that she has a valid driver's license, but that she only drives about once a month to the laundromat or to pick up prescriptions, and that someone else drives her to her doctor's appointments. R. at 48-49. Ms. Martin testified that she does not drive more often because she does most of her sleeping during the day, and that she has fallen asleep at a stoplight while driving. R. at 86. Ms. Martin testified that she does not go out alone, and that someone is always with her when she drives. R. at 49. Ms. Martin testified that when she goes to the laundromat, it is a drop-off service, so she does not have to do the laundry herself. R. at 56. Ms. Martin also testified that one of her sons or a laundromat employee takes the laundry to and from the car. R. at 56. Ms. Martin testified that she does not attend any of her sons' school

activities because of the embarrassment caused by her excessive
uterine bleeding, and because of the sleepiness she feels during
the day. R. at 85.

With regard to her activities of daily living, Ms. Martin
testified that she mostly just sits around during the day. R. at
52. She testified that she received physical and occupational
therapy from January 2006 to the summer of 2008, but indicated
that she is still limited in what she can do. R. at 52-53. She
testified that she dresses herself, that her husband sets up her
breakfast in the morning and helps her bathe at night. R. at 53.
Ms. Martin testified that she cooks only using the microwave, and
that she does not use the stove. R. at 58. Ms. Martin testified
that her husband prepares her food such that she only has to use
the microwave because she is afraid of having an accident while
standing in front of the stove, or falling asleep and starting a
fire. R. at 87. Ms. Martin testified that she does not have
problems picking up small items with either of her hands and can
use normal utensils like a knife, fork, and toothbrush. R. at 55,
58. She testified that she can fully extend her right arm, but
can only raise her left arm just above her head because it is
weak. R. at 54.

With regard to her past employment, Ms. Martin testified
that she worked as a CNA in a nursing home from November 1999 to
April 2000. R. at 68. As a CNA, Ms. Martin typically performed

total body assist with the help of a machine for patients who could not lift themselves out of bed. R. at 68. Ms. Martin also helped patients with bathing, feeding, ventilator care, and cleaning their rooms and environment. R. at 68. Additionally, Ms. Martin was required to fill out reports. R. at 68. Ms. Martin testified that ninety percent of her time as a CNA was spent standing, walking, and lifting. R. at 69.

Ms. Martin also testified that she worked as an EKG tech in a hospital from January 2002 to July 2005. R. at 65. As an EKG tech, Ms. Martin performed EKGs, routine and emergency stress tests, Holter monitor hookups, and worked as a team player for a cardiac response team. R. at 65. The EKG tech position required Ms. Martin to be on her feet all day. R. at 65. The position also required Ms. Martin to assist patients weighing anywhere from 5 to 300 pounds to and from a bed and a treadmill, and to lift equipment that weighed between 10 to 15 pounds. R. at 66.

Ms. Martin testified that, at the time of her stroke in December 2005, she had been working at a call center as an order entry operator for approximately one month. R. at 59, 63. From November 2006 to February 2007 Ms. Martin worked as a babysitter. R. at 62. Ms. Martin testified that she worked six hours per day. However, Ms. Martin testified that she was never alone with the child as she received help from her sister who was living with her at the time. R. at 63. Ms. Martin testified that she was

rehired at the call center in 2007, but on her third day of work she became very dizzy. R. at 59. Ms. Martin testified that her husband took her to her treating physician, cardiologist Dr. Sheik, who told her that she could not sit for the amount of time she was required to sit at her job at the call center. R. at 60. Ms. Martin further testified that Dr. Sheik told her that if she sat for more than an hour, she then needed to get up and move around for at least an hour. R. at 60.

Ms. Martin testified that she thought she was not able to work because of her excessive uterine bleeding, which she claimed was a result of the medications she was taking. R. at 73. In addition to the generic form of Coumadin, Ms. Martin testified that she was taking an iron supplement, Zoloft, and over-the-counter sleep aids. R. at 73-74. Ms. Martin testified that her cardiologist told her that the Coumadin was not the cause of her excessive uterine bleeding, but that when she stopped taking the Coumadin, the bleeding decreases. R. at 77-78. However, Ms. Martin testified that when she stops taking the Coumadin, her legs become very tight behind her calves, and her left side is weakened. R. at 78. Additionally, Ms. Martin testified that, when she is taking Coumadin, she feels sleepy all the time, but that her sleep schedule is erratic—she might sleep at night for a week straight, and then be awake all night for another week. R. at 78.

Ms. Martin testified that her doctors told her that her prescription for Zoloft should, but did not help with her sleep problems. R. at 78. Ms. Martin testified that prior to December 2005 she was taking no medications at all, and did not have depression. R. at 75. Ms. Martin also testified that Dr. Phillips, Dr. Sheik, and Dr. Anthony had recommended that she get counseling each time she had a regular doctor visit, but that she was unable to get counseling because she didn't have insurance and she did not want to be admitted to a psychiatric hospital. R. at 75-76. While Ms. Martin never told her doctors that she was going to kill herself, she did testify that she told them that she did not want to live. R. at 76.

Ms. Martin testified that her gynecologist began giving her Depo Lupron injections to control her bleeding in 2007, but that her cardiologist ordered her to stop in October 2009. R. at 81. As a result, Ms. Martin testified that she then chose to have an endometrial ablation surgery. R. at 81, 344. Ms. Martin also testified that she thought the loss of her balance, which started in December 2005, prevented her from working. R. at 82. Ms. Martin testified that she can sit down and walk through her apartment without any trouble, but she loses her balance when she takes longer trips or when she stands in place. R. at 83. Ms. Martin testified that, while she has fallen before, she does not fall often because she is not very active. R. at 84.

Ms. Martin also testified that she is 5'6" and weighs 300 pounds. R. at 87. Ms. Martin testified that her cardiologist told her that losing 100 pounds would help control her bleeding problems. R. at 87-88. Ms. Martin testified that she has lost twenty pounds in the last three years, but that she cannot exercise in order to lose more weight because she could hurt herself. R. at 88. Ms. Martin further testified that, while she is taking Coumadin, leaving the house terrifies her because of the extent of her uterine bleeding, which has soaked through her clothes and the chairs and couches on which she has sat despite taking the precaution of wearing Depends with the added protection of a sanitary napkin. R. at 89-91. Ms. Martin testified that, to avoid potential embarrassment, she would stand against a wall near a restroom when she is out, but ultimately that she just does not go out. R. at 96. Ms. Martin testified that when she is at home, she has to change her protection every twenty to thirty minutes. R. at 95.

The ALJ next heard testimony from Dr. Larry Kravitz, a Medical Expert. R. at 97. Dr. Kravitz began by clarifying with Ms. Martin that her cardiologist, Dr. Shiek, initially prescribed her Zoloft, but that when she is unable to get to Dr. Shiek, she has gotten refills from Dr. Anthony, whom she has seen since she was 13 years old and who is aware of her situation both emotionally and physically. R. at 98-99.

Dr. Kravitz then testified that the record supported a finding that Ms. Martin had medically determinable impairments of dysthymic and depressive disorders. R. at 101. In terms of severity, Dr. Kravitz noted that the Psychiatric Review Technique (Exhibit 8-F) and the Mental Residual Functional Capacity Assessment (Exhibit 9-F), both from Carl Hermsmeyer, Ph.D, and the Medical Interrogatory (Exhibit 11-F) from Ellen Rozenfeld, Psy.D, found Ms. Martin to have a severe impairment that limited her to simple one and two step tasks at a consistent pace. R. at 101. Dr. Kravitz then testified:

> We don't have very much medical evidence, almost none, essentially, since the consultative evaluation [on November 28, 2007]. Having said that, [Ms. Martin] offers fairly compelling testimony that her medical condition has left her despondent, overwhelmed, feeling isolated from others, feeling embarrassed, and fairly trapped by her current situation. So, my impression is, while [Ms. Martin] is certainly capable of understanding, remembering, [and] carrying out simple and detailed instructions and capable of maintaining, at the least, brief and superficial contacts with others, my clinical impression is I think she would have significant difficulty handling the stressors of a work setting given her testimony. That's putting much weight on her testimony.

R. at 102.

Dr. Kravitz then recommended contacting Dr. Anthony because of his awareness of Ms. Martin's situation, in which case a statement corroborating Ms. Martin's testimony "might prove sufficient." R. at 102-03. Dr. Kravitz also found it significant that Dr. Herman Langner gave Ms. Martin a GAF of only 40 despite

13

only diagnosing her with dysthymic disorder in his November 28, 2007 Consultative Examination Report (Exhibit 5-F). Dr. Kravitz interpreted this to imply that Ms. Martin's "overall functioning was fairly compromised even at that point." R. at 103. Dr. Kravitz noted that the GAF of 40 was only significant "if you want to infer that [Ms. Martin] wasn't doing real well" and that Dr. Langner did not explain his reasons for assigning Ms. Martin that score. R. at 103. Additionally, Dr. Kravitz recognized that other medical consultants "didn't come to that conclusion" but that "[t]hey didn't have the benefit of hearing [Ms. Martin's] testimony as I did today. Where she really expounded on all the limitations, emotionally that have been created." R. at 104.

Dr. Kravitz also noted that Ms. Martin's husband's daily activity report, written in October 2007, expressed similar things to Ms. Martin's testimony. R. at 104. Dr. Kravitz testified:

> [H]e's saying that she does manage basic activities, taking care of food and children's needs, that she'[s] capable of managing finances, but he does conclude by saying . . . "Always had a strong desire to return to work in the nursing, medical field [and] the most difficult part of the tragedy for her has been to try to accept the fact of not being physically able to perform the minimum duties of that industry, the time -- she's spent hours crying with long conversations about feeling like a burden to her family, not being able to contribute financially, her limitations on what she can do." So he's noting that her stress tolerance, I think, is fairly limited even at that point.

14

R. at 104-05. Nevertheless, Dr. Kravitz admitted that Exhibits 9-F and 11-F concluded that Ms. Martin "would be able to do certain repetitive work." R. at 105-107. Dr. Kravitz then explained that his opinion that Ms. Martin would have significant difficulty handling the stressors of a work setting was based on his impression of Ms. Martin's testimony, as it was consistent with her and her husband's earlier statements, but that he was "not saying at this point that [he] would accept [his] severity assessment." R. at 107.

While Dr. Kravitz again stressed the lack of medical evidence, he testified that an updated mental status or a psychiatric evaluation would not add much more to Ms. Martin's testimony because it would not be related to the gap in the medical evidence. R. at 107-08. Instead, Dr. Kravitz suggested that a source who has been working with Ms. Martin—like Dr. Anthony or Dr. Shiek—would be able to provide the relevant information as to Ms. Martin's level of severity. R. at 108-09. Ultimately, Dr. Kravitz testified that some corroboration of Ms. Martin's testimony was necessary because she was describing more severe symptomology than was described in the Consultative Evaluation. R. at 110.

Finally, the ALJ heard testimony from Stephen Sprauer, a Vocational Expert, who had reviewed Ms. Martin's work record. R. at 111. Mr. Sprauer first testified that no transferrable skills

would have come from Ms. Martin's past jobs including Nurse Assistant, Electrocardiograph Technician, Order Clerk, and Child Monitor. R. 114, 294. Next, Mr. Sprauer testified that a person of Ms. Martin's age, education and work experience who could lift twenty pounds on occasion and ten pounds frequently, stand or walk six hours a day, sit six hours a day, climb ramps and stairs on occasion, only frequently lift the left arm due to mild residual weakness, could do all other lifting by the right arm, but was also restricted to simple one and two step tasks could not perform any of Ms. Martin's past jobs. R. at 115. However, Mr. Sprauer testified that such a person could perform other jobs, including Small Products Assembler, Packager, and Sorter, all unskilled, light jobs. R. at 115-16.

The ALJ then asked Mr. Sprauer whether the additional limitation that the person could only handle occasional changes in her routine in the work setting would change any of the jobs the person would be able to perform. R. at 116. Mr. Sprauer testified that such a limitation would not impact any of the jobs. R. at 116. The ALJ also asked whether a limitation that the person could have only occasional interaction with the public would impact any of the jobs the person would be able to perform. R. at 116. Mr. Sprauer again testified that such a limitation would have no impact. R. at 116-17. Finally, the ALJ asked whether a limitation that the person could have only occasional

interaction with coworkers would impact any of the jobs the
person would be able to perform. R. at 117. Mr. Sprauer yet again
testified that such a limitation would not have a significant
impact. R. at 117.

The ALJ also asked Mr. Sprauer whether the above
hypothetical person, with limitations that the person could have
only occasional interaction with coworkers and the public could
perform any of the positions listed in the Bureau of Disability
Determination Services' Report of Contact (Exhibit 6-E) including
Injection Molding Machine Tender, Core Extruder, and Racker. R.
at 117-121. Mr. Sprauer emphasized that those positions were not
ones which he had identified, but testified that the hypothetical
person could perform them. R. at 120-21.

The ALJ then added the additional limitation that the
hypothetical person would be limited to sedentary work—lifting up
to ten pounds occasionally, standing or walking for two hours per
eight hour workday, sitting for six hours per eight hour work
day, and no climbing—and simple, routine, and repetitive tasks
with only occasional changes in the work setting in terms of
tasks performed, but no limitation on interaction with coworkers.
R. at 122. Mr. Sprauer testified that such a person could work as
an Escort Vehicle Driver and a Charge Account Clerk. R. at 122.
Mr. Sprauer testified that adding a limitation of only occasional
interaction with the public would eliminate the Charge Account

Clerk position but the Escort Vehicle Driver position would still be available. R. at 123. Similarly, Mr. Sprauer testified that further adding a limitation of only occasional interaction with coworkers would eliminate the Charge Account Clerk position but not the Escort Vehicle Driver position. R. at 123.

The ALJ next asked whether adding a limitation that the person would be required to have a stand/sit option would impact either of the sedentary jobs that Mr. Sprauer identified. R. at 123. Mr. Sprauer testified that the stand/sit option is not identified in the Department of Labor regulations. R. at 123. However, Mr. Sprauer testified that, based on an experiential standpoint, such a limitation "would impact the ability to be an Escort Vehicle Driver, because you can [not] sit and stand when you drive." R. at 124. Mr. Sprauer also testified that, with respect to the Charge Account Clerk position, such a limitation would be very dependent upon the specific employer. R. at 124. Similarly, with respect to the light, unskilled jobs including small parts assembly and packager/sorter, Mr. Sprauer testified that a stand/sit option would be employer dependent. R. at 125-26.

Ms. Martin's attorney then questioned Mr. Sprauer about tolerable absences. R. at 127. He testified that, although tolerable absences are not covered by the DOT, or any Department of Labor publications that Mr. Sprauer was familiar with, skilled

positions come with a much greater tolerance of absences than
unskilled, hourly positions. R. at 127. Mr. Sprauer indicated
that typically six to twelve unplanned absences is tolerable on
an annual basis. R. at 127-28. Additionally, Ms. Martin's
attorney asked Mr. Sprauer about his understanding of employer
tolerances for being on task. R. at 128. Again, Mr. Sprauer
indicated that being on or off task is not something covered by
the DOT or in the Department of Labor publications or
regulations. R. at 131. However, Mr. Sprauer did testify that, as
much as being on or off task is job dependent, a person who was
off task for half of the day could not sustain a job. R. at 129.

Mr. Sprauer also testified that most employers would find an
employee taking two or three five to ten minute breaks in
addition to the standard three breaks per eight hour day to be
excessive. R. at 129. Additionally, Mr. Sprauer testified that
accommodation of extra breaks would be employer dependent, but
that employers would be less accommodating to positions with a
lower skill level. R. at 130.

At the close of the hearing, the ALJ granted Ms. Martin
thirty days to submit additional medical records. R. at 134.
And, after the hearing, Ms. Martin submitted additional medical
records which documented her treatment at Advocate Christ
Hospital beginning on March 30, 2010. R. at 23. Ms. Martin was
admitted to the emergency room complaining of shortness of breath

and chest pain. R. at 821-823. Ms. Martin was treated with
Heparin, two blood transfusions, and Tylenol for pain as needed.
R. at 827-28. A CT scan revealed what were likely small pulmonary
emboli. R. at 823. On March 31, 2010, Ms. Martin was treated with
Heparin, two blood transfusions, and Tylenol for pain as needed.
R. at 827-28. However, a bilateral lower extremity venous doppler
dated April 1, 2010 resulted in no evidence of deep venous
thrombosis. R. at 824. Furthermore, an April 2, 2010
echocardiographic report found normal biventricular systolic
function and that the valves are functionally unremarkable. R. at
826. On April 2, 2010, Ms. Martin began complaining of back pain
and constipation. R. at 830. Ms. Martin was treated with pain
medication, including Norco and Tylenol, and was monitored
frequently. R. at 830-33.  On April 5, 2010, Ms. Martin received
a tap water enema, and was started on Coumadin due to an improved
platelet count. R. at 834. After being treated with the pain
medication Norco, Ms. Martin described her pain to be 2 out of
10, and slept through the night. R. at 834. On April 6, 2010, Ms.
Martin received education regarding nutrition and antibiotics,
and reviewed Coumadin and Vitamin K guidelines. R. at 835-36. In
the afternoon of April 7, 2010, Ms. Martin denied any pain or
discomfort and received another unit of blood. R. at 836-37. On
April 8, 2010, Ms. Martin was alert, oriented, and resting well;
she was discharged that day.  R. at 837-38.

Ms. Martin returned to Advocate Christ Medical Center on April 22, 2010 with complaints of left and right groin pain and left leg pain. R. at 781. Evidence for bilateral acute deep vein thrombosis was found in the right leg involving the common femoral vein to the junction with the saphenous and in the left leg extending from the common femoral vein through the popliteal vein. R. at 780. On April 23, 2010, Ms. Martin complained of left thigh pain, and was started on PCA Dilaudid. R. at 782. Ms. Martin reported decreasing leg pain by April 25, 2010 and was discharged on April 29, 2010. R. at 785, 790.

The ALJ issued her decision on August 10, 2010, denying Ms. Martin's claim for Social Security Disability Insurance Benefits. R. at 17. The ALJ initially determined that Ms. Martin (1) met the insured status requirements of the Social Security Act through December 31, 2011; (2) had not engaged in substantial gainful activity since the alleged onset date of January 31, 2007; and (3) has severe impairments of dysthymic disorder, status/post cerebrovascular accident with residual weakness, and obesity. R. at 19.

The ALJ next concluded that Ms. Martin did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. R. at 19. The ALJ then found that Ms. Martin had the residual functional capacity to perform light work except that she (1) should never climb

ladders, ropes, scaffolds, and only occasionally climb stars and ramps; (2) should perform only frequent reaching in all directions with the left arm, including overhead work; and (3) is limited to simple, routine, and repetitive tasks with only occasional changes in the work setting routine, and only occasional interaction with the general public and coworkers. R. at 21. Accordingly, the ALJ determined that Ms. Martin was unable to perform any past relevant work, but concluded that she could perform other jobs existing in significant numbers in the national economy. R. at 26. Therefore, the ALJ determined that Ms. Martin did not have a disability within the meaning of the Social Security Act from January 31, 2007 through the date of the decision.

After the Appeals Council denied review, Ms. Martin filed a lawsuit in this Court, seeking review of the Social Security Administration's final agency decision. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on April 4, 2012. Thereafter, the parties filed their cross motions for summary judgment.

## *Discussion*

To qualify for Social Security Disability Insurance Benefits, a claimant must be "under a disability" within the meaning of the Social Security Act. 42 U.S.C. § 423(a)(1)(E) (2006 & Supp. 2012) (effective March 2, 2004). Under the

authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1) (2012). The five-step sequential evaluation process requires the Commissioner to determine: (1) whether the claimant is currently doing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Social Security Administration; (4) whether the claimant can perform past work; and (5) whether the claimant is capable of performing work in the national economy. 20 C.F.R. § 404.1520(a)(4) (2012). *See also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

The claimant has the burden to establish: (1) that she is not doing substantial gainful activity; (2) that she has a severe impairment; and (3) that her impairment meets or equals one of the listed impairments; or (4) that she cannot perform her past work if her impairment does not meet or equal one of the listed impairments. *Knight*, 55 F.3d at 313. If the claimant's impairment does not meet or equal one of the listed impairments, but the claimant establishes that she cannot perform her past work, the burden at step five shifts to the Social Security Administration to establish that the claimant is capable of performing work in the national economy. *Id.*

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994). A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g) (2006 & Supp. 2012) (effective December 18, 2010); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In order to affirm the ALJ's decision, the Court must find the decision to be supported by substantial evidence on the record as a whole, and "must take into account whatever in the record fairly detracts from its weight." *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). Substantial evidence is "more than a mere scintilla;" rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Nevertheless, an ALJ must articulate her analysis by building an accurate and

logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the ALJ's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision. *Id.* Instead, the Court must remand if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review. *Id.*

Ms. Martin argues that the ALJ's decision must be reversed or remanded for several reasons. First, she argues that the ALJ improperly failed to include limits with regard to concentration, persistence and pace and that the ALJ otherwise improperly determined her RFC. Ms. Martin also argues that the ALJ failed to consider pertinent medical evidence – notably, the ME's testimony – and that the ALJ improperly evaluated her credibility. The Court considers each argument below.

1. *The ALJ's Findings Concerning Concentration, Persistence and Pace*

With respect to the ALJ's alleged failure to include limits with regard to concentration, persistence, or pace on Ms. Martin's residual functional capacity, Ms. Martin argues that the ALJ failed to limit her exposure to work-related stress. The Commissioner disagrees, noting that the ALJ included such limits

when she determined that Ms. Martin could perform only to simple, routine, repetitive tasks.

A hypothetical question posed to a vocational expert by an ALJ must include all limitations supported by medical evidence in the record, and "must account for all documented limitations of concentration, persistence, or pace." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (internal quotations omitted). However, there is no *per se* requirement that the specific terminology "concentration, persistence, or pace" be used in the hypothetical. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). For example, an ALJ's hypothetical that omits the terms "concentration, persistence, or pace" will stand when it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619.

Here, the ALJ determined that Ms. Martin had "moderate difficulties with concentration, persistence, or pace." R. at 20. In so finding, the ALJ gave great weight to opinions in the Mental Residual Functional Capacity Assessment completed by Dr. Hermsmeyer and the Medical Interrogatory completed by Dr. Rozenfeld. *Id.* Dr. Hermsmeyer concluded that Ms. Martin retained the mental capacity to perform simple one and two-step tasks at a consistent pace. R. at 435. Dr. Rozenfeld concluded that, while Ms. Martin's ability to carry out tasks with persistence and pace

would be somewhat reduced, it would still be adequate for completion of routine, repetitive tasks. R. at 444.

At the hearing, the first hypothetical question the ALJ asked the vocational expert included the limitation that "the claimant also would be restricted to simple one and two-step tasks." R. at 115. The vocational expert identified three positions that such a hypothetical person could perform: Small Products Assembler, Packager, and Sorter. R. at 115-16. Similarly, in a subsequent restrictive hypothetical, the ALJ included the restriction to "simple, routine, and repetitive tasks with only occasional changes in the work setting . . . ." R. at 122. The vocational expert then identified two positions that such a hypothetical person could perform: Escort Vehicle Driver and Charge Account Clerk. R. at 122.

Although the ALJ did not use the terms "concentration, persistence, or pace," the restriction to simple one and two-step tasks incorporated Dr. Hermsmeyer's conclusion, and the later restriction to routine and repetitive tasks incorporated Dr. Rozenfeld's conclusion. In other words, it is "manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619. Accordingly, the ALJ properly accounted for Ms. Martin's limitations with regard to concentration, persistence, or pace.

*2. The ALJ's Discussion of the ME's Testimony*

Next, Ms. Martin argues that the ALJ improperly dismissed the medical expert's opinion that she "would have significant difficulty handling the stressors of a work setting given her testimony." She also argues that the ALJ failed to explain how the medical expert's opinion was not supported by the findings of Dr. Langner. The Commissioner responds that the medical expert acknowledged that his testimony on the subject of workplace stress was not a medical opinion because of the lack of medical evidence.

An ALJ's decision "must articulate at some minimal level" an analysis of all the relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In doing so, the ALJ must construct an accurate and logical bridge between the evidence and the conclusion. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). Additionally, the ALJ may not omit discussion of evidence that contradicts the ultimate conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). Furthermore, while an ALJ is not required to produce a complete written evaluation of every piece of evidence in the record, the ALJ must explain the weight given to opinion of consultative physicians. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011).

Here, the medical expert "indicated that the claimant would have difficulty handling the work setting, but would be able to

complete simple instructions and handle at least brief and superficial contact with others." R. at 25. But, as the ALJ noted, the medical expert indicated that his opinion in this regard was based on the hearing testimony and not on any supporting medical records because there were none. In fact, as the ALJ noted, the ME "recommended that records from treating physician Dr. Anthony should be ordered in order to provide concrete information concerning the claimant's mental status." R. at 25. Indeed, the medical expert's testimony repeatedly referenced the lack of medical evidence to corroborate Ms. Martin's admittedly compelling testimony. R. at 102, 107. The medical expert ultimately concluded that some medical evidence —in the form of a statement from a physician familiar with Ms. Martin — to corroborate Ms. Martin's testimony was necessary because she was describing more severe symptomology than was described in the Consultative Evaluation. R. at 110. To this end, the ALJ held the record open for submission of additional records after the hearing, but Ms. Martin failed to submit any records that would have been relevant to her mental status. What she did submit related to post-hearing emergency room visits for chest pain and leg/groin pain. These records do nothing to corroborate her testimony as to the severity of her mental impairment.

The ALJ's decision also gave consideration to Dr. Langner's consultative examination. The ALJ acknowledged that the medical

expert noted that Dr. Langner gave Ms. Martin a GAF score of 40. R. at 25. However, the ALJ noted that the medical expert further explained that the GAF score was a very brief mental status examination, that there was only evidence of a tearful affect to support the finding, and that the score was not explained well. *Id.* For those reasons, the ALJ found that it was of little value in determining Ms. Martin's residual functional capacity. *Id.*

In short, contrary to Ms. Martin's arguments, the ALJ sufficiently articulated her analysis of the medical expert's testimony and Dr. Langner's consultative examination regarding the severity of Ms. Martin's mental impairment.

### 3. *The ALJ's Findings Concerning Credibility*

Next, Ms. Martin challenges the ALJ's credibility findings. In particular, Ms. Martin challenges the ALJ's use of the boilerplate language criticized by the Seventh Circuit in Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012). But the use of the boilerplate language by itself is not problematic; the problem comes when the ALJ says nothing further about the issue. That did not happen here. After using the boilerplate language, the ALJ here went on for several pages to explain her findings on the subject. The Court rejects this argument.

Ms. Martin also challenges the ALJ's determination that her credibility was undermined by her continued engagement in a "wide array of daily activities." She argues that the record does not

support this finding; that she basically testified that she does nothing all day. The ALJ recognized this, but also recognized that her testimony was inconsistent with her report to the consultative examiner that she was able to take care of her activities of daily living and the testimony that she shops and can perform personal care and hygiene activities.

Ms. Martin also argues that the ALJ was wrong to draw any negative inference from the fact that she did not seek treatment for her depression. An ALJ must explore the claimant's reasons for a lack of medical care before drawing a negative inference therefrom. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). *See also McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010) (ALJ must consider claimant's inability to afford treatment); *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (ALJ must consider claimant's mental illness, which itself may prevent the claimant from seeking treatment); *Godbey*, 238 F.3d at 809 (ALJ must consider a claimant's reliance on others, or inability to travel to physicians' offices). Here, the ALJ noted that Ms. Martin was depressed but sought no treatment because she did not want to go to the doctor. R. at 25. But this was just one factor the ALJ considered in assessing the impact of her depression. The ALJ also considered the lack of any medical records to corroborate the severity of her mental impairment, and

the lack of any evidence demonstrating that her depression was long lasting or severe.

Despite this, the ALJ nonetheless accepted that Ms. Martin's stress tolerance was limited, and she, accordingly, limited Ms. Martin to "simple, routine, and repetitive tasks with only occasional changes in her routine in the work setting." R. at 25.

4.   *The ALJ's Treatment of Evidence of Excessive Bleeding*

Having said all of the above, there is one issue where the ALJ's credibility analysis - or lack thereof - does pose a real problem.  Ms. Martin argues that the ALJ failed to account for her excessive uterine bleeding and failed to consider how this might affect her residual functional capacity.

In determining a claimant's residual functional capacity, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling. *Vilano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ noted that Ms. Martin had a long history of heavy menstrual periods, and that she received periodic treatment for menometrorrhagia.[3] Accordingly, the ALJ was required to evaluate any limitations

---

[3] Menometrorrhagia is defined as "[i]rregular or excessive bleeding during menstruation and between menstrual periods." *Stedmans Medical Dictionary* 246650 (27th ed. 2000).

that arose from Ms. Martin's excessive uterine bleeding, even though the ALJ did not find the impairment to be severe.

At the hearing, Ms. Martin testified that, because of her excessive uterine bleeding, she wears both Depends undergarments and sanitary napkins. R. at 89-91. Despite this double protection, Ms. Martin testified, she has to change her pads every twenty to thirty minutes to prevent the blood from soaking through her clothing. R. at 95. In response to questioning from Ms. Martin's attorney, the vocational expert testified that most employers would find an employee taking two or three five to ten minute breaks in addition to the standard three breaks per eight hour day to be excessive. R. at 129. The vocational expert also testified that accommodation of extra breaks would be employer dependent, but that employers would be less accommodating to positions with a lower skill level. R. at 130. This evidence undermines the ALJ's RFC determination and her findings concerning Ms. Martins' ability to work. The ALJ should have evaluated the potential limitations that arose from Ms. Martin's excessive uterine bleeding and she did not.

It is possible that the ALJ simply disbelieved Ms. Martin's testimony concerning the extent of the bleeding and the frequency with which she is required to change her pads. Indeed, the Commissioner argues that there is no objective medical evidence to support Ms. Martin's testimony; the Commissioner also notes

that Ms. Martin testified that the bleeding improved when she stopped taking Coumadin and that she did not complain of excessive bleeding at her consultative examination with Dr. Shah. And these might be valid reasons for discounting her credibility with respect to the issue. But the ALJ did not discuss the issue; she certainly did not offer these points to justify rejecting Ms. Martin's testimony. And the *Chenery* doctrine forbids an agency's lawyers from defending the agency's decision on grounds that the agency itself had not embraced. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citing *SEC v. Chenery*, 318 U.S. 80, 87-88 (1943)). The ALJ erred by failing to include any discussion of potential limitations that arose from Ms. Martin's excessive uterine bleeding, and by failing to discuss – or potentially even consider – the effect her bleeding would have on her ability to work. Given the testimony by the VE that the breaks required to address her bleeding would render her unemployable, the ALJ should at least have addressed the issue.

## *Conclusion*

For the foregoing reasons, the Court finds that the ALJ erred by failing to consider or discuss how Ms. Martin's excessive uterine bleeding affected her residual functional capacity. Accordingly, remand is appropriate. The Court grants Ms. Martin's motion for summary judgment [Docket #24]. The case

is remanded to the Commissioner for further proceedings

consistent with this Memorandum Opinion and Order.


Date: August 12, 2013

                                              E N T E R
                              E D:


                              _____
                              MAGISTRATE JUDGE ARLANDER KEYS
                              UNITED STATES DISTRICT COURT